| | |
|---|---|
| **MIGUEL ANGEL CRISTOBAL LOPEZ,** ) <br> **MAGDALENO LORENZO ROMAN** ) <br> **PEREZ, OCTAVIO CARLOS BARO** ) <br> **ROMERO, ARTURO BARO ROMERO,** ) <br> **ROBERTO CALVO ROSALES, MAURO** ) <br> **FERRER SANTIAGO, ABRAHAM** ) <br> **OCAMPO BAHENA, VICENTE PEDRAZA** ) <br> **REZA, FRANCISCO JAVIER ROGEL** ) <br> **BEDOLLA, LUIS ROBERTO ROGEL** ) <br> **HERNANDEZ, ISMAEL RUIZ** ) <br> **ZEFERINO, GIOVANNI SANCHEZ** ) <br> **HERNANDEZ, MIGUEL ANGEL SIERRA** ) <br> **EVERASTICO, GUILLERMO RUIZ** ) <br> **ZEFERINO, and JUAN CALDERON** ) <br> **LAGUNAS,** ) <br>  ) <br> **Plaintiffs,** ) <br>  ) <br> v. ) <br>  ) <br> **JIMMY CARROLL FISH d/b/a FISH** ) <br> **FARMS, WALTER JACKSON FISH d/b/a** ) <br> **FISH FARMS, and CHRISTINE FISH** ) <br> **GILLIAM d/b/a FISH FARMS,** ) <br>  ) <br> **Defendants.** ) | Civil Action No. _____ |

# COMPLAINT

1. This is an action by fifteen migrant farmworkers who were employed by Defendant Fish Farms to cultivate and harvest tomatoes in and around Newport, Tennessee. Fish Farms recruited the workers to come to Tennessee from Mexico to perform farm labor for their East Tennessee operations, doing so pursuant to the federal government's H-2A

1

guestworker program. Under that program, employers may petition to bring foreign workers to the United States on temporary visas.

2.	The H-2A program requires participating employers to comply with minimum standards governing terms and conditions of employment for imported labor, including health and safety standards for employer-provided housing, and to ensure that the importation of workers does not negatively impact the local workforce. Defendants failed to comply with those standards. Instead, believing they had a captive labor force that was Hispanic and Mexican and could not or would not complain or enforce the law, Defendants flagrantly violated federal H-2A standards. Defendants subjected Plaintiffs to intolerable working and housing conditions, including acute exposure to pesticides, and forced Plaintiffs to wash their clothes in an adjacent river.

3.	When Plaintiffs "dared" to complain about these violations to Tennessee and federal authorities, Defendants acted swiftly and decisively to silence Plaintiffs. After the United States Department of Labor arrived at Defendants' farm to begin an investigation, Defendants falsely accused one of the Plaintiffs of aggravated assault and had him arrested in front of the other workers. During this incident, Defendants and their agents also surrounded Plaintiffs' housing, brandishing firearms, intimidating Plaintiffs and interfering with the U.S. Department of Labor's investigation.

4.	Approximately two weeks later, and immediately after Plaintiffs attempted to document additional pesticide exposure, Defendants retaliated again, physically threatening Plaintiffs. Defendants invaded Plaintiffs' housing area, yelling racial slurs, kicked in the door of one plaintiff's trailer, and grabbed cell phones from several Plaintiffs. Then Defendants

2

fired Plaintiffs *en masse* and corralled Plaintiffs onto a waiting bus, held them on the bus for several hours, refusing to permit them to get off, and carried out what was in effect a private deportation of Plaintiffs by taking them to a bus station to return them to Mexico.

5. Plaintiffs bring this action to secure and vindicate their rights under the Fair Labor Standards Act ("FLSA"), the Tennessee Public Protection Act ("Tennessee Whistleblower Statute"), federal and Tennessee civil rights laws, and Tennessee contract law.

6. As set forth in this complaint, Plaintiffs claim that: (a) because they are Hispanic and Mexican, they were subjected by Defendants to inhumane and unlawful terms and conditions of employment; (b) because they filed complaints about the unlawful terms and conditions of their employment with the United States Department of Labor and the Tennessee Department of Agriculture, Defendants retaliated against them, including by firing them; and (c) by engaging in this conduct, Defendants violated the terms of Plaintiffs' employment contracts. For these violations, Plaintiffs seek damages and declaratory relief.

## JURISDICTION AND VENUE

7. Plaintiffs are each citizens of Mexico. Defendants are each citizens of the State of Tennessee. Each plaintiff seeks compensatory and punitive damages in excess of $75,000 exclusive of interest and costs. The Court accordingly has diversity jurisdiction over this case under 28 U.S.C. § 1332(a)(3).

8. The Court also has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 29 U.S.C. § 216(b) (FLSA).

9. The Court has supplemental jurisdiction over Plaintiffs' Tennessee statutory and common law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and Defendants Jimmy Carroll Fish, Walter Jackson Fish, and Christine Fish Gilliam each reside in this District.

## PARTIES

11. Each Plaintiff is Hispanic and a citizen of Mexico and was lawfully admitted to the United States as an agricultural guestworker on a temporary work visa ("H-2A visa") pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

12. The following Plaintiffs in this action were employed by Defendants to perform farm labor from approximately June 18, 2010 to September 5, 2010: Arturo Baro Romero, Octavio Carlos Baro Romero, Roberto Calvo Rosales, Miguel Ángel Cristóbal López, Mauro Ferrer Santiago, Abraham Ocampo Bahena, Vicente Pedraza Reza, Francisco Javier Rogel Bedolla, Luis Roberto Rogel Hernández, Magdaleno Lorenzo Román Pérez, Ismael Ruiz Zeferino, Giovanni Sánchez Hernández, and Miguel Ángel Sierra Everástico.

13. Plaintiff Guillermo Ruiz Zeferino ("Plaintiff Zeferino") was employed by Defendants to perform farm labor from approximately June 18, 2010 to August 23, 2010.

14. Plaintiff Juan Calderón Lagunas ("Plaintiff Lagunas") was employed by Defendants to perform farm labor from approximately June 18, 2010 to a date between August 23, 2010 and September 5, 2010.

4

15. Defendant Jimmy Carroll Fish resides in Cocke County, Tennessee. On information and belief, Defendant Jimmy Fish does business as "Fish Farms," which has its principal place of business in Cocke County, Tennessee. Defendant Jimmy Fish acts as a manager at Fish Farms.

16. Defendant Walter Jackson Fish resides in Cocke County, Tennessee. On information and belief, Defendant Walter Fish does business as "Fish Farms," which has its principal place of business in Cocke County, Tennessee. Defendant Walter Fish acts as a manager at Fish Farms.

17. Defendant Christine Fish Gilliam resides in Cocke County, Tennessee. On information and belief, Defendant Gilliam does business as "Fish Farms," which has its principal place of business in Cocke County, Tennessee. Defendant Gilliam acts as a manager at Fish Farms, serves as Fish Farms' bookkeeper, and is the Certified Worker Protection Standard Trainer for purposes of pesticide use.

18. At all times relevant to this action, Defendants Jimmy Fish, Walter Fish, and Gilliam acted as "employers" of Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d); the Tennessee Whistleblower Statute, Tenn. Code Ann. 50-1-304(2); and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-102(B)(5).

## STATEMENT OF FACTS

19. On February 12, 2010, claiming a shortage of domestic workers to fill its labor needs for the 2010 tomato season, Fish Farms petitioned the U.S. Department of Labor ("USDOL") for certification to employ temporary foreign workers. The petition was filed

pursuant to 8 U.S.C. § 1188(i)(2), which provides statutory authorization for what is commonly referred to as the "H-2A" program.

20. Under the H-2A program, an agricultural employer in the United States may import non-immigrant foreign workers to perform agricultural labor of a temporary nature if USDOL certifies that: (a) there are insufficient available workers to perform the work, and (b) the employment of foreign workers will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188(a)(1). Foreign workers admitted in this fashion are usually referred to as "H-2A workers."

21. On March 5, 2010, USDOL issued a certification authorizing Fish Farms to import sixty H-2A workers, as Fish Farms had requested. The certification included a "clearance order" or "job order," 20 C.F.R. §§ 655.122, specifying minimum wages, benefits, and working conditions that Defendants would be required to offer and guarantee to all H-2A workers imported and employed by them. The terms of such a clearance order create an enforceable contract between H-2A workers and their employer.

22. On or about June 18, 2010, Plaintiffs arrived at Fish Farms to begin working pursuant to their H-2A contracts.

23. While working at Fish Farms, Plaintiffs were engaged in the production of goods for commerce as that phrase is used in the FLSA.

**A.    Discriminatory Terms and Conditions of Employment**

24. Throughout their employment at Fish Farms, Plaintiffs were forced to endure inhumane conditions, including unsafe and unsanitary housing and exposure to pesticides.

6

25. Defendants subjected Plaintiffs to these conditions because Plaintiffs were Hispanic and from Mexico.

26. These inhumane conditions took the following forms, among others:

    a. <u>Pesticide Exposure</u>. On repeated occasions and in apparent violation of the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136-136, the United States Environmental Protection Agency's Worker Protection Standard, 40 C.F.R. §§ 156, 170, and the Tennessee Insecticide, Fungicide, and Rodenticide Act, Plaintiffs were subjected to acute pesticide exposures from spraying both in close proximity to their living quarters and in the fields at the same time they were working. Defendants exposed Plaintiffs to pesticides as a result of their: failures to monitor and supervise pesticide applicators; failures to provide applicators and farmworkers with adequate and effective pesticide safety training; violations of restricted entry intervals (REIs), mandatory waiting periods during which fields must be quarantined after application of pesticides before field work can start or resume; failures to provide decontamination facilities; and failures to provide workers with personal protective equipment; and misuse of pesticides. Plaintiffs have video evidence of instances of Defendants' improper spraying.

    b. <u>Unsound, Unsafe and Unsanitary Housing</u>. Pursuant to federal law, H-2A employers must furnish H-2A workers with housing. In violation of 20 C.F.R. § 654.407(a), the housing furnished by Defendants to Plaintiffs did not provide protection against the elements. Plaintiffs were housed in insect-infested, over-crowded trailers with holes in the ceilings and walls through which water leaked when it rained. In addition, in

violation of 20 C.F.R. § 654.408, windows and doors on the trailers were not closed to the outside; screens were torn and not functional.

    c. <u>Denial of Water</u>. In violation of applicable health and safety standards, Defendants failed to provide Plaintiffs with an adequate and convenient supply of potable water. The only drinking water available to Plaintiffs was grainy and discolored.

    d. <u>Denial of Laundry Facilities</u>. In violation of applicable health and safety standards, Defendants failed to provide Plaintiffs with any laundry facilities. Instead, Defendants instructed Plaintiffs to wash their clothes in the river adjacent to their housing that had been provided by Defendants.

**B.** **Retaliatory Discharge**

  27. In late June 2010, Plaintiffs began consulting with legal services attorneys about possible wage and hour violations as well as the housing and health and safety issues described in paragraphs 24 to 26, above. Plaintiffs continued to consult and meet with legal services attorneys and paralegals numerous times in July and August of 2010.

  28. On July 29, 2010, with the assistance of counsel from Southern Migrant Legal Services ("SMLS"), Plaintiffs complained in writing to the Pesticides Administrator of the Tennessee Department of Agriculture ("TDA"), citing frequent exposure to pesticides while working at Fish Farms, physical symptoms, and the absence of medical care. This complaint requested that the workers' identities remain anonymous to protect them from retaliation. The filing of this complaint was protected activity under T.C.A. 50-1-304.

  29. On August 2, 2010, Plaintiffs, with the assistance of SMLS counsel, complained in writing to the Knoxville Area Office of the Wage and Hour Division of

USDOL, expressing concern that the conditions of their employment by Fish Farms violated federal and state workplace laws, regarding both pay practices and housing conditions, including apparent violations both of the FLSA and H-2A regulations. The complaint requested that USDOL keep the names of the workers complaining confidential to protect them from retaliation. The filing of the complaint was protected activity under 29 U.S.C. § 215(a)(3).

30. On August 11, 2010, provoked by these administrative complaints filed by Plaintiffs, an attorney representing Fish Farms, William Leibrock, telephoned SMLS. Mr. Leibrock expressed outrage that workers had filed complaints with the government. He requested that SMLS disclose to him the names of all workers represented by SMLS and involved with filing complaints. He stated that Defendants did not want people who were suing them to be working for them. He further stated that Plaintiffs and their attorneys at SMLS had "stirred up a hornet's nest" and that any worker who did not want to be at the farm should go back to Mexico right away.

31. On August 16, 2010, SMLS attorneys visited Fish Farms to conduct interviews of Plaintiffs. In a letter dated August 18, 2010, Mr. Leibrock reiterated that he wanted to know the names of each of the workers represented by SMLS for purposes of filing the complaints. He also stated that, "If we have unhappy workers who are filing lawsuits against my clients, we certainly have the right to know who our accusers are and to take whatever steps are legally necessary to correct the problem."

32. On or about August 23, 2010, investigators from USDOL conducted an on-site investigation of Plaintiffs' complaints. They began at Fish Farm's offices, where they met

9

Defendant Gilliam and Fish Farms manager, Stephanie Price. The USDOL investigators then proceeded, accompanied by Defendant Gilliam and Price, to Plaintiffs' living quarters to speak with Plaintiffs and inspect the housing. Plaintiffs' discussions with the investigators were impeded more than once by Defendant Gilliam and Price, who also telephoned Defendants Jimmy Fish and Walter Fish, who then joined Defendant Gilliam and Price on the scene and arrived brandishing firearms.

33. At one point, Price started yelling at Plaintiff Zeferino, who had just stepped out of his trailer to see what was going on, claiming she felt threatened by him. One or more of the Defendants called local police, who came to the scene but then, after an initial investigation, left. The USDOL investigators, still present, continued their conversations with Plaintiffs and examination of the living quarters. Local police officers later returned and took Plaintiff Zeferino into custody based on the false accusations by Price.

34. Plaintiff Zeferino was charged with aggravated assault, allegedly of Price. The charges, which related to allegations that Plaintiff Zeferino threatened Price with a knife, had no validity and were dropped several weeks later after USDOL investigators, who also had been eyewitnesses to the interactions between Plaintiff Zeferino and Price, indicated that they were willing to testify on his behalf and arrived at the courthouse for a preliminary hearing prepared to do so. In the interim, however, Plaintiff Zeferino was held for several days in the Cocke County jail and Defendants terminated his employment.

35. Plaintiff Lagunas felt threatened and afraid as a result of the incident with Plaintiff Zeferino. Shortly after it occurred, he left Fish Farms.

10

36. Defendants terminated Plaintiff Zeferino and constructively discharged Plaintiff Lagunas for filing complaints regarding working and living conditions at Fish Farms and participating in the Department of Labor investigation.

37. On September 5, 2010, pesticides were again sprayed in close proximity to Plaintiffs, who again feared exposure to pesticides. This time, several of the Plaintiffs attempted to use their cellphones to video record the tractors as they passed by Plaintiffs' living quarters spraying pesticides.

38. One or more of the tractor drivers responded by telephoning Defendants Jimmy Fish and/or Walter Fish who, in turn, retaliated by firing *en masse* all thirteen of the remaining Plaintiffs. Plaintiffs' attempts to gather video evidence to support their complaints to federal and state authorities was the final trigger for Defendants' decision to fire Plaintiffs *en masse* for having filed complaints with federal and state authorities.

39. The circumstances of the termination of Plaintiffs' employment were willfully and wantonly abusive. Defendants Jimmy and Walter Fish arrived at Plaintiffs' living quarters, began swearing at them and cursing them, shouting "fucking Mexicans," "motherfucking Mexicans," "no more work for Mexicans," "Mexicans are shit" and "[you are all] going back to Mexico." Several Plaintiffs, fearing for their physical safety, withdrew to their trailers, attempting to lock themselves inside the trailers to protect themselves. Defendant Walter Fish followed after them, kicking in the door of one of the trailers. Defendant Walter Fish also forcibly confiscated cell phones he saw, including those of Plaintiff Ismael Ruiz Zeferino and Miguel Angel Cristobal Lopez, hoping to seize all video evidence of pesticide exposure violations.

40. Defendants Jimmy and Walter Fish then rounded up all the Plaintiffs and forced them to board a bus (normally used to transport workers form living quarters to the tomato fields). The Fishes photographed each Plaintiff as he boarded the bus, continuing to curse the Plaintiffs, assaulting them with slurs such as "You are shit," and "Mexicans are shit."

41. Once all Plaintiffs had boarded the bus, Defendants Jimmy and Walter Fish instructed the driver to drive the bus to the Fish Farms office. Defendants Jimmy and Walter Fish, Price, and Gilliam were all present at the office. Plaintiffs were given final paychecks and were kept confined or imprisoned on the bus outside the Fish Farms office for several hours, barred from exiting the bus even to use the restroom.

42. After one of the Plaintiffs managed to contact USDOL by cell phone, a USDOL investigator arrived at Fish Farms but Defendants prevented her from speaking to Plaintiffs. Defendants' agents started the engine of the bus and steered it away from the Fish Farms office and drove out of Newport toward Morristown. They continued driving, with Plaintiffs in the bus, for several hours until after dark, in an apparent attempt to find a bus that could immediately transport Plaintiffs back home to Mexico. When no buses could be found that were departing immediately, and because Defendants refused to allow Plaintiffs to return to the farm, Defendants left Plaintiffs in Morristown, where they spent the night at a motel.

43. The next day, Plaintiffs took a commercial bus from Morristown, to begin the return trip to Mexico.

44. All actions and omissions alleged herein were undertaken by Defendants either directly and/or through their agents.

## FIRST CAUSE OF ACTION:

(Against All Defendants)

(Discharge And Discrimination In Violation Of FLSA § 15(a)(3))

45. Plaintiffs restate and reallege Paragraphs 1 to 44, above.

46. In retaliation for having filed a complaint with the USDOL and asserting their rights under the FLSA, Defendants wrongfully and illegally fired Plaintiffs Arturo Baro Romero, Octavio Carlos Baro Romero, Roberto Calvo Rosales, Miguel Ángel Cristóbal López, Mauro Ferrer Santiago, Abraham Ocampo Bahena, Vicente Pedraza Reza, Francisco Javier Rogel Bedolla, Luis Roberto Rogel Hernández, Magdaleno Lorenzo Román Pérez, Ismael Ruiz Zeferino, Giovanni Sánchez Hernández, Juan Calderón Lagunas, and Miguel Ángel Sierra Everástico.

47. In retaliation for his having filed a complaint with the USDOL and asserting his rights under the FLSA, Defendants caused unsubstantiated criminal charges to be filed against Plaintiff Guillermo Ruiz Zeferino and wrongfully and illegally fired him.

48. This retaliation was willful on the part of Defendants.

49. As a consequence of Defendants' retaliatory conduct, which was proscribed by 29 U.S.C. §§ 215 (a)(3) and 216(b), Plaintiffs are entitled to recover compensatory and liquidated damages.

## SECOND CAUSE OF ACTION:

(Against All Defendants)

13

(Discrimination in Violation Of 42 U.S.C. § 1981)

50. Plaintiffs restate and reallege Paragraphs 1 to 49, above.

51. Defendants' right to import temporary foreign labor was conditioned upon Defendants' agreement to abide by the minimum wages, benefits and conditions of employment set forth in the Clearance Order they submitted to USDOL. The terms of that Clearance Order governed the employment relationship between Defendants and Plaintiffs. By their conduct described above, Defendants directly and intentionally denied Plaintiffs' contractual minimum wages, benefits, and conditions of employment and did so because of Plaintiffs' race, ancestry, or ethnic characteristics.

52. The conditions under which Defendants required Plaintiffs to live and work were so severe and pervasive that a reasonable person would find them hostile or abusive, and Plaintiffs in fact perceived them to be hostile and abusive.

53. By reason of the conduct described above, Defendants caused injury to Plaintiffs, including but not limited to mental anguish, emotional pain and suffering, loss of enjoyment of life, and humiliation, warranting an award of compensatory and punitive damages.

**THIRD CAUSE OF ACTION:**

(Against All Defendants)

(Retaliatory Discharge in Violation of the Tennessee Public Protection Act)

54. Plaintiffs restate and reallege Paragraphs 1 to 53, above.

55. Defendants wrongfully and illegally fired each Plaintiff because he had instituted complaints with the USDOL and TDA, alleging illegal activities by the

14

Defendants, implicating important public policy concerns, rather than remaining silent; because he was participating in USDOL and TDA investigations of those complaints; and/or because he had gathered and preserved, or they believed he had gathered and preserved evidence, or could provide evidence, to support those complaints.

56. As a consequence of Defendants' termination of their employment, in retaliation for these activities, Plaintiffs are entitled to recover compensatory and punitive damages pursuant to Tenn. Code Ann. 50-1-304.

## FOURTH CAUSE OF ACTION

(Against All Defendants)

(Discrimination in Violation of the Tennessee Human Rights Act)

57. Plaintiffs restate and reallege Paragraphs 1 to 56, above.

58. Defendants violated Plaintiffs' rights by maintaining an objectively hostile and abusive work environment on account of Plaintiffs' race and/or national origin.

59. The unwelcome harassment and abuse to which Defendants subjected Plaintiffs on account of their race and/or national origin was sufficiently severe and pervasive to constitute a hostile, offensive, and intimidating work environment.

60. Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of race and/or national origin.

61. The unlawful employment practices complained of above caused injury to Plaintiffs, including but not limited to mental anguish, emotional pain and suffering, loss of enjoyment of life, and humiliation, warranting an award of compensatory damages.

15

# FIFTH CAUSE OF ACTION:

(Against All Defendants)

(Breach of Contract)

62. Plaintiffs restate and reallege Paragraphs 1 to 61 of their Complaint.

63. The USDOL clearance orders described in Paragraph 21 of this Complaint constituted an employment contract between Defendants and each Plaintiff.

64. Plaintiffs performed all contractual obligations of employment that they were called upon to perform under their employment contracts with Defendants.

65. Defendants failed to perform their obligations under their employment contracts with each Plaintiff and breached contractual obligations owed by them to each Plaintiff, including by:

   a. Failing to furnish housing that met the substantive health and safety standards set forth at 29 C.F.R. § 1910.142 and/or 20 C.F.R. §§ 654.404 - 654.417;

   b. Failing to provide minimum terms and conditions of employment required by federal and state law; and

   c. Intimidating, threatening, discriminating against, and discharging Plaintiffs for asserting their rights, consulting with legal assistance attorneys, and filing complaints with state and federal government agencies.

66. Defendants' breaches of Plaintiffs' employment contracts caused Plaintiffs substantial injuries, including lost wages.

67. Defendants' conduct was intentional, fraudulent, malicious, and/or reckless, warranting an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

a. Enter a declaratory judgment that Defendants violated Plaintiffs' rights under the FLSA, 42 U.S.C. § 1981, the Tennessee Public Protection Act, the Tennessee Human Rights Act, and the common law;

b. Award Plaintiffs compensatory damages for the harm they suffered as a result of Defendant's violations of the FLSA, 42 U.S.C. § 1981, the Tennessee Public Protection Act, the Tennessee Human Rights Act and the breach of their employment contracts, including but not limited to lost wages and other consequential and emotional distress damages;

c. Award Plaintiffs liquidated damages for Defendants' violations of the FLSA and punitive damages for Defendants' violations of 42 U.S.C. § 1981, the Tennessee Public Protection Act, and the common law;

d. Award Plaintiffs pre-judgment and post-judgment interest as allowed by law;

e. Award Plaintiffs costs, expenses and attorneys' fees; and

f. Grant such further relief as the Court deems just and appropriate.

Dated: April 12, 2011

>Respectfully Submitted,
>
> **/s/ Melody Fowler-Green**
> Melody Fowler-Green
> Tennessee Bar No. 023266
> Email: mfgreen@trla.org
> Member, Eastern Dist.
>
> Caitlin Berberich
> Tennessee Bar No. 025780
> Email: cberberich@trla.org
> *Pro Hac Vice Pending*
>
> SOUTHERN MIGRANT LEGAL SERVICES
> A Project of Texas RioGrande Legal Aid, Inc.
> 311 Plus Park Blvd. Ste. 135
> Nashville, TN 37217
> Telephone: (615) 750-1200
> Fax: (615) 366-3349
>
> Matthew J. Piers
> Illinois Bar No. 2206161
> Email: mpiers@hsplegal.com
> *Pro Hac Vice Pending*
>
> Joshua Karsh
> Illinois Bar No. 6203096
> Email: jkarsh@hsplegal.com
> *Pro Hac Vice Pending*
>
> Caryn C. Lederer
> Illinois Bar No. 6304495
> Email: clederer@hsplegal.com
> *Pro Hac Vice Pending*
>
>
> HUGHES SOCOL PIERS RESNICK & DYM, LTD.
> 70 W. Madison Street, Suite 4000

Chicago, IL 60602
Telephone: (312) 580-0100
Fax: (312) 580-1994

*Attorneys for Plaintiffs*